# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:16-CR-00019-21 |
| v. | (Judge Brann) |
| SHAKEEN ASMAR TAYLOR, | |
| Defendant. | |

## MEMORANDUM OPINION

### JUNE 8, 2021

**I.    BACKGROUND**

In 2016, Shakeen Asmar Taylor was indicted in a second superseding indictment for conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, and distribution/possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).[1] The Government thereafter filed a notice, pursuant to 21 U.S.C. § 851, that it sought enhanced criminal penalties based upon Taylor's prior drug conviction.[2]

Taylor later pled guilty, pursuant to a written plea agreement, to conspiracy to distribute 100 grams or more of heroin.[3] The plea agreement provided that Taylor would be subject to a minimum term of five years' imprisonment as a result of the withdrawal of the Government's § 851 notice.[4] The parties also agreed to

---

[1]   Doc. 362.
[2]   Doc. 901.
[3]   Doc. 1126.
[4]   *Id.* at 3.

recommend that Taylor was responsible for distributing or possessing with the intent to distribute at least 700, but less than 1,000, grams of heroin.[5]

At the guilty plea hearing, the Government set forth the facts that it would have presented to support the charge against Taylor. The Government stated that "Shakeen Taylor, Kalif English, Sharonda Walker, Troy Brown, Keith Harding, Eric Harding, and conspirators known to the grand jury, managed the other co-defendants in crews that used seven separate cell phones, or traps, to supply drug customers with heroin."[6] The trafficking organization quickly responded to heroin orders in and around Williamsport and Bloomsburg, Pennsylvania, as well as other communities along Interstate 80.[7] When the organization would sell out of heroin, they would stop responding to customer calls, travel to Philadelphia to purchase more heroin, and then send out text messages to their customers stating that the organization again had heroin to sell.[8]

Taylor personally operated the cell phones with the numbers 570-337-9429 and 570-974-6925, both of which "were well know[n] to heroin customers."[9] Taylor often used vehicles with hidden compartments to conceal drugs and cash proceeds from the sale of drugs.[10] He used various motels in the Williamsport area—along

---

[5] *Id.* at 9.
[6] Doc. 1476 at 19.
[7] *Id.*
[8] *Id.* at 19-20.
[9] *Id.* at 20.
[10] *Id.*

2

with customers' residences—as temporary bases of operation to store the heroin for sale.[11]

Law enforcement officials initially arrested nineteen members of the trafficking conspiracy but, despite the arrest of these individuals, "[p]en register activity showed that members of the conspiracy continued to operate customer cell phones" as the phone numbers were simply transferred "to devices operated by Shakeen Taylor, together with Nasheen Taylor, and Naheem Stinnet and other co-conspirators."[12] When customers called the phone numbers that had previously been serviced by the arrested coconspirators, the customers were directed to the remaining coconspirators, including Taylor, Richard Black, Jarrett Craddock, and Raquan Blow-Enty.[13]

The Government recounted that "on June 16, 2016, Black and Blow-Enty sold $100 worth of heroin, packaged in blue waxen bags, to a confidential human source, or CHS, following a call to the customer cell phone operated by Shakeen Taylor."[14] After exchanging a series of text messages with Black and Blow-Enty, the CHS met Black and Blow-Enty in a church parking lot in Watsontown, Pennsylvania; the CHS provided money to the driver, Black, while the passenger, Blow-Enty, provided the CHS with heroin.[15] During the transaction, the CHS observed Black and Blow-Enty

---

[11] *Id.*
[12] *Id.* at 20-21.
[13] *Id.* at 21.
[14] *Id.*
[15] *Id.* at 21-22.

with a large plastic bag containing large quantities of packaged heroin.[16] The CHS informed law enforcement that he/she had previously purchased heroin from Black and Blow-Enty, and that the two "worked for Malik, as Shakeen Taylor was known to the CHS."[17]

On June 23, 2016, the CHS contacted the same trap phone and arranged the purchase of a brick—or 50 bags—of heroin from Black and Blow-Enty.[18] The transaction occurred in substantially the same manner as the transaction on June 16, but occurred at a different location.[19]

On June 30, 2016, the CHS again contacted the phone operated by Taylor and arranged to purchase 11 bags of heroin from Craddock for $100.[20] During the transaction, "the CHS asked Craddock about the quality of the heroin. In speaking of its quality, Craddock mentioned Malik, referring to Shakeen Taylor."[21]

Finally, on August 3, 2016, the CHS made a controlled purchase of heroin from Craddock and Taylor.[22] The CHS initiated the purchase by calling the same trap phone that was operated by Taylor, and met Craddock and Taylor near Montoursville, Pennsylvania.[23] Craddock and Taylor arrived in a black Ford Taurus;

---

[16] *Id.* at 22.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 23.
[21] *Id.*
[22] *Id.*
[23] *Id.* at 23-24.

4

Taylor gave the CHS five bundles of heroin and directed the CHS to provide $400 to Craddock.[24]

Immediately after the controlled purchase, law enforcement officers arrested Craddock and Taylor; at the time of their arrests, Craddock was in possession of approximately $2,000, while Taylor had $355 and a black Apple iPhone with the number 570-337-9429, which was the number that the CHS had previously called to arrange heroin purchases.[25] During an inventory search of the Ford Taurus, law enforcement recovered 57 bags of heroin, as well as "the customer phone that the CHS used to order heroin from Craddock and Taylor on August 3, 2016, and a few weeks previously from Black and Blow-Enty on June 16 and June 23, 2016."[26] The CHS informed law enforcement that Taylor had delivered heroin to him/her on multiple occasions using the same Ford Taurus.[27] The Government related that "Taylor's trap cell phones generated substantial amounts of cash from the sales of heroin, and were known in the local drug trade as $10,000 per day phones."[28]

Taylor generally agreed with the factual basis provided by the Government, although he disagreed with any assertion that he ran a drug trafficking network, that he was referred to as Malik, or that he traded heroin for firearms.[29] Upon further

---

[24] *Id.*
[25] *Id.* at 24.
[26] *Id.*
[27] *Id.* at 25.
[28] *Id.*
[29] *Id.* at 26-27.

5

inquiry, Taylor agreed that he conspired with other individuals to distribute heroin using certain cellphone numbers.[30]

The Court ultimately accepted the guilty plea, and a Presentence Report (PSR) was prepared.[31] The PSR calculated a base offense level of 28, but added two level for possessing firearms, two levels for maintaining a premises for the purposes of distributing a controlled substance, two levels for committing the offense as part of a pattern of criminal conduct engaged in as part of a livelihood, and four levels for leading criminal activity that involved five or more participants.[32] The PSR reduced the offense level by two for acceptance of responsibility, for a total offense level of 36.[33] The PSR calculated a criminal history category II which, when combined with an offense level 36, resulted in an advisory Sentencing Guidelines range of 210 to 262 months' imprisonment.[34]

Taylor's attorney lodged several objections to the PSR, including to the enhancements for: possession of a firearm, maintaining a premises for the purpose of distributing a controlled substance, being an organizer or leader in a conspiracy that involved five or more people, and to the assignment of criminal history points.[35]

---

[30] *Id.* at 27-29.
[31] Docs. 1145, 1394.
[32] Doc. 1394 at 12-13.
[33] *Id.* at 13.
[34] *Id.* at 14-17, 24.
[35] Doc. 1395 at 2-4, 7-8.

As to the firearm enhancement, Taylor's attorney argued that the Government could not establish that Taylor possessed a firearm in relation to the charged conduct.[36]

Counsel further argued that the leadership enhancement was unwarranted, as Taylor's conduct was similar to that of other individuals in the conspiracy, and he did not direct anyone else's activities, nor did he receive a larger portion of the proceeds from the sale of heroin.[37] Taylor's attorney emphasized that the phone number that was used to conduct heroin sales "was passed between various individuals"; Taylor did not own or control the number, other individuals often used the phone number without Taylor's knowledge, and Taylor "did not direct any drug sales other than his own."[38] Moreover, Taylor's attorney asserted that the facts produced by the Government demonstrated that Taylor was connected to, at most, three other individuals and, thus, he could not have been the leader of a group of five or more individuals.[39] Counsel also asserted that there was no evidence that Taylor controlled any premises in the Williamsport area for the primary purpose of distributing controlled substances.[40] Finally, Taylor's attorney withdrew the objection to an increase in the offense level based upon the offense being part of a pattern of criminal conduct engaged in as a livelihood.[41]

---

[36] Doc. 1416 at 2.
[37] *Id.* at 2-4.
[38] *Id.* at 3-4.
[39] *Id.* at 4.
[40] *Id.* at 4-5.
[41] *Id.* at 4.

7

At sentencing, the Court sustained the objection to the enhancement for possession of a firearm. The Court concluded that neither a high capacity firearm magazine nor a firearm that was discovered in a vehicle in which Taylor was an occupant could definitively be attributed to Taylor.[42]

As to the four-level enhancement for being a leader or organizer of criminal activity that included five or more people, the Court sustained in part Taylor's objection. Specifically, the Court determined that, while Taylor was not an organizer or leader of criminal activity, he was a manager or supervisor of criminal activity that involved five or more people, and therefore a three-level increase was warranted pursuant to U.S. Sentencing Guidelines Manual § 3B1.1(b).[43] Finally, the Court determined that an increase in Taylor's offense level for maintaining a premises for the purpose of distributing a controlled substance was not warranted.[44] Taylor's attorney also confirmed that he was withdrawing the objection to an enhancement for criminal livelihood, as well as the objection to Taylor's criminal history.[45]

The Court further granted an additional one-level reduction in offense level for acceptance of responsibility.[46] As a result of the Court's rulings, Taylor's offense level was 30 and his criminal history category was II, resulting in a Sentencing

---

[42] Doc. 1440 at 8-11.
[43] *Id.* at 19-21.
[44] *Id.* at 23-24.
[45] *Id.* at 24-26.
[46] *Id.* at 24-25.

Guidelines range of 108 to 135 months' imprisonment.[47] Taylor's attorney argued that a downward variance was appropriate in part to avoid unwarranted sentencing disparities.[48] In particular, counsel noted that a coconspirator had also pled guilty to conspiracy to distribute a controlled substance, was found responsible for between 700 and 1,000 grams of heroin, and was sentenced to 108 months' imprisonment.[49] However, in that instance, the coconspirator was found to be an organizer or leader of criminal activity involving five or more people,[50] which made his offense more serious than Taylor's, as the coconspirator was "an upper-level distributor . . . [who] organized and coordinated cell phones and set up deals with at least seven other members" of the conspiracy.[51]

After hearing from the parties, the Court imposed a sentence of 108 months' imprisonment.[52] That sentence was driven largely by the seriousness of Taylor's crime of conviction and the devastating impact that heroin has on communities.[53]

Taylor thereafter filed an appeal with the United States Court of Appeals for the Third Circuit.[54] However, the Government filed a motion to dismiss the appeal

---

[47] *Id.* at 28-29.
[48] *Id.* at 29-30.
[49] *Id.*; Doc. 1416 at 7. Counsel erroneously referred to this coconspirator as Keith Harding, when the coconspirator to whom counsel was referring was Eric Harding.
[50] *See United States v. Harding*, No. 16-CR-00019-22 (M.D. Pa., Doc. 1419 at 3-5).
[51] Doc. 1440 at 30.
[52] *Id.* at 39.
[53] *Id.* at 37-39.
[54] Docs. 1431, 1433.

based upon an appellate waiver contained in the plea agreement; the Third Circuit granted that motion and dismissed the appeal.[55]

In 2020, Taylor filed this timely 28 U.S.C. § 2255 motion challenging the sentence imposed based upon allegations of ineffective assistance of counsel.[56] First, Taylor asserts that his attorney was ineffective for failing to inquire about the organizational structure of the drug trafficking organization and, consequently, failing to adequately rebut the assertion that Taylor was a manager or supervisor of that organization.[57] Second, Taylor alleges that counsel was ineffective for failing to obtain sentencing statistics that allegedly would have shown that the sentence imposed resulted in sentencing disparities.[58]

The Government has responded to Taylor's § 2255 motion and asserts that Taylor did not receive ineffective assistance of counsel.[59] The Government contends that the evidence strongly supported the enhancement for a managerial role in conspiracy, and counsel argued against the enhancement as effectively as he possibly could.[60] Finally, the Government argues that, in light of the sentence imposed, even if counsel had performed deficiently, Taylor suffered no resulting prejudice.[61] This

---

[55] *United States v. Taylor*, No. 19-2441 (3d Cir. ECF Nos. 25, 29).
[56] Doc. 1507.
[57] Doc. 1507-1 at 5-10.
[58] *Id.* at 10-11.
[59] Doc. 1534.
[60] *Id.* at 14-20, 23-28.
[61] *Id.* at 28-30.

matter is now ripe for disposition and, for the following reasons, the Court will deny Taylor's motion.

## II. DISCUSSION

"In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims."[62] "The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"[63] In determining whether an attorney's performance is deficient, courts must "determine whether, in light of all the circumstances, the [attorney's] acts or omissions were outside the wide range of professionally competent assistance."[64] As the United States Supreme Court has emphasized:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[65]

"The second part [of the *Strickland* test] specifies that the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

---

[62] *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015).
[63] *Id.* (quoting *Strickland*, 466 U.S. at 687).
[64] *Strickland*, 466 U.S. at 690.
[65] *Id.*

probability is a probability sufficient to undermine confidence in the outcome.'"[66] "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable."[67] "In the context of a guilty plea, the prejudice prong of the test requires a showing 'that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'"[68]

As to Taylor's contention that counsel was ineffective for failing to properly rebut the assertion that Taylor was a manager or supervisor of a drug trafficking organization that involved five or more people, the Court finds this contention to be without merit. Although Taylor argues that counsel did not properly understand the organization of the criminal enterprise and thus did not properly argue against the sentencing enhancement, the facts belie this argument, and the record demonstrates that Taylor's attorney argued persuasively and effectively against the sentencing enhancement.

As an initial matter, it is apparent to the Court that counsel's description of the criminal enterprise largely comports with Taylor's description of the

---

[66] *Bui*, 795 F.3d at 366 (quoting *Strickland*, 466 U.S. at 694).
[67] *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks omitted).
[68] *United States v. Fazio*, 795 F.3d 421, 426 (3d Cir. 2015) (quoting *Hill v. Lockhart,* 474 U.S. 52, 59 (1985)).

organization. Thus, Taylor asserts that the organization was somewhat decentralized, with leadership setting up cellphone numbers for trafficking and advertising those numbers to customers, and then providing those numbers to lower-level traffickers in exchange for a percentage of any profits from the sale of drugs.[69] As a result of this structure, Taylor asserts that he did not control the phone numbers that he used, and he allegedly operated entirely independently of Craddock, Blow-Enty, Black, and others involved in the drug trafficking organization.[70]

During sentencing, counsel similarly asserted that Taylor "did not have complete control over" the phone number that he used, and he shared that phone number with Craddock, Blow-Enty, and Black.[71] Counsel asserted that those coconspirators were "all in the same level" of the organization, and Taylor did not exercise any type of control over them.[72] Counsel stressed that "Taylor has no control over who uses that number or when they use that number," the phone number that Taylor used was frequently transferred between different individuals, and Taylor "[h]ad nothing to do with other people" who used the phone number.[73]

Counsel's explanation of Taylor's involvement in the drug trafficking organization thus substantially mirrors Taylor's explanation of that organization. Moreover, in addition to those arguments about Taylor's role in the organization,

---

[69] Doc. 1507-1 at 8.
[70] *Id.*
[71] Doc. 1440 at 11-12.
[72] *Id.* at 12.
[73] *Id.* at 17-18.

13

counsel also focused on the degree of control that Taylor exercised over others, his decision making authority within the conspiracy, and the amount of proceeds that Taylor derived from the organization as compared to other within the organization.

As to proceeds, counsel noted that when Taylor was arrested "he had $355 on his person, and the gentleman sitting next to him, Jarrett Craddock, had [$]1,600."[74] He further emphasized that, although the Government characterized the cellphone numbers "as $10,000-a-day phones," the Government pointed only to $49,000 in deposits in Taylor's bank account, which would equate to approximately "five days of work" if Taylor exclusively controlled the phone.[75] With respect to decision making authority and exercising control over others, counsel argued that Taylor was "not organizing like Mr. Harding, talking calls in Philadelphia, sending people out, doing any of that. These are deals he would take the call, he would make the deal."[76] Counsel also emphasized that the Government had listed a number of individuals whom it believed were leaders of the organization, and Taylor was not listed among those individuals.[77]

While Taylor dismisses these arguments as mere "rambl[ings],"[78] such arguments were highly relevant to the analysis of whether Taylor was a leader or

---

[74] *Id.* at 11.
[75] *Id.* at 13.
[76] *Id.* at 13.
[77] *Id.* at 11.
[78] Doc. 1507-1 at 8.

14

organizer of criminal activity.[79] Not only were the arguments relevant, but they were effective as well, and directly led to the Court partially sustaining Taylor's objection to the PSR and reducing the enhancement from a four-level enhancement to a three-level enhancement.[80] Given that Taylor's attorney not only presented arguments similar to Taylor's unusual-organization-structure-theory, but also had some success in presenting other arguments that Taylor was not a leader of criminal activity, the Court cannot conclude that counsel was constitutionally ineffective in his advocacy related to the enhancement for being a leader of criminal activity that involved five or more people.

Turning to Taylor's assertion that counsel was ineffective for failing to obtain sentencing statistics that would have shown that the sentence imposed allegedly resulted in unwarranted sentencing disparities,[81] the Court again finds Taylor's claim to be without merit. Taylor claims that, had counsel referenced available data from the United States Sentencing Commission, it would have shown that the only defendant within the Middle District of Pennsylvania who was similarly situated to Taylor had received a lesser sentence for a similar crime than did Taylor.[82]

---

[79] *See* U.S. Sentencing Guidelines Manual § 3B1.1(a) cmt. n.4 (2018) (setting forth factors that are indicative of a leadership within a criminal organization, including "the exercise of decision making authority," "the claimed right to a larger share of the fruits of the crime," and "the degree of control and authority exercised over others").
[80] Doc. 1440 at 19-21.
[81] *Id.* at 10-11.
[82] Doc. 1507-1 at 10-11.

Despite this assertion, Taylor's attorney did argue at sentencing that the Court should impose a lesser sentence to avoid unwarranted sentencing disparities.[83] As noted previously, counsel argued that a coconspirator had also pled guilty to conspiracy to distribute a controlled substance and was found responsible for between 700 and 1,000 grams of heroin, and was sentenced to 108 months' imprisonment.[84] However, in that instance, the coconspirator was found to be an organizer or leader of criminal activity involving five or more people,[85] which made his offense more serious than Taylor's, as the coconspirator was "an upper-level distributor . . . [who] organized and coordinated cell phones and set up deals with at least seven other members" of the conspiracy.[86] Thus, although counsel did not reference statistics from the Sentencing Guidelines Commission, he pointed to a contemporaneous example of how a higher sentence may result in unwarranted sentencing disparities.

The Court ultimately found counsel's argument unavailing, and it is tempting to conclude that the better course of action may have been for counsel to cite to Sentencing Guidelines Commission statistics to buttress his argument regarding unwarranted sentencing disparities. The Court is mindful, however, "that '[a] fair assessment of attorney performance requires that every effort be made to eliminate

---

[83] Doc. 1440 at 29-30.
[84] *Id.*; Doc. 1416 at 7.
[85] *See United States v. Harding*, No. 16-CR-00019-22 (M.D. Pa., Doc. 1419 at 3-5).
[86] Doc. 1440 at 30.

the distorting effects of hindsight . . ."[87] Counsel pursued a reasonable strategy in setting forth his arguments, and he was not required to "leave no stone unturned and no witness unpursued."[88] Because counsel presented a reasonable argument that a lesser sentence was required to avoid unwarranted sentencing disparities, the Court cannot conclude that his performance was deficient, or that Taylor was prejudiced in any way by counsel's performance.[89] Accordingly, this claim also fails, and Taylor's § 2255 motion must be denied.

Because the Court will deny Taylor's § 2255 motion, this decision is not appealable unless this Court or a circuit justice issues a certificate of appealability.[90] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[91] To satisfy this standard Taylor must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional claim is debatable or wrong.[92] The Court finds that Taylor has not met this burden, and therefore declines to issue a certificate of appealability.

---

[87] *United States v. Sepling*, 944 F.3d 138, 146 (3d Cir. 2019) (quoting *Strickland*, 466 U.S. at 689).
[88] *Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001) (internal quotation marks omitted).
[89] Notably, there is no indication that the individual to whom Taylor cites in his brief is similarly situated to Taylor, such that a sentencing disparity could be considered an *unwarranted* sentencing disparity. Small differences between the defendants—for example, whether the criminal activity was driven by drug addiction or the type of previous crime that led to a particular criminal history category—may have a significant impact in the sentence that is ultimately imposed. Taylor does not discuss these potential differences in his brief.
[90] 28 U.S.C. § 2253(c)(1)(B).
[91] *Id.* § 2253(c)(2).
[92] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Taylor's claims are without merit. Accordingly, Taylor's 28 U.S.C. § 2255 motion will be denied, and the Court will deny a certificate of appealability.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge